IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2024

**STATE OF TENNESSEE v. KERRINGTON J'KOBE LAKE**

**Appeal from the Circuit Court for Madison County**
**No. 24-244    Donald H. Allen, Judge**

_____

**No. W2024-01207-CCA-R3-CD**

_____

The Defendant, Kerrington J'Kobe Lake, entered guilty pleas to two felonies, felony evading arrest and attempted tampering with evidence; and three misdemeanors, speeding, reckless driving, and simple possession of marijuana, with the trial court to determine whether to grant judicial diversion or, alternatively, the length and manner of his sentence. Following a sentencing hearing, the trial court denied the Defendant's request for judicial diversion and imposed an effective sentence of three years, with the Defendant to serve 180 days in jail before serving the remainder of his sentence on supervised probation. On appeal, the Defendant argues the trial court (1) unreasonably denied judicial diversion, and (2) imposed an excessive sentence. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JILL BARTEE AYERS, JJ., joined.

James Andrew Farmer, Jackson, Tennessee, for the appellant, Kerrington J'Kobe Lake.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Matthew Floyd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On July 29, 2023, the Defendant, Kerrington J'Kobe Lake, led police on a high-speed chase after the officer attempted to stop him for speeding. After the Defendant lost control of his vehicle, he and his passengers fled on foot, leaving behind a bag containing marijuana. Following the Defendant's arrest, the Madison County Grand Jury indicted the Defendant on seven counts: speeding (count 1), a Class C misdemeanor; reckless driving (count 2), a Class B misdemeanor; felony evading arrest (count 3), a Class E felony;

evading arrest (count 4), a Class A misdemeanor; simple possession of marijuana (count 5), a Class A misdemeanor; possession of legend drug without a prescription (count 6), a Class C misdemeanor; and tampering with evidence (count 7), a Class C felony. See Tenn. Code Ann. §§ 55-8-152, 55-10-205, 39-16-603, 39-16-603(a)(1), 39-17-418, 53-10-104, 39-16-503(a)(1).

On June 24, 2024, the Defendant entered guilty pleas in counts 1, 2, 3, and 5, and entered a guilty plea to the lesser-included offense of attempted evidence tampering, a Class D felony, in count 7. Pursuant to the plea agreement, the Defendant would be sentenced concurrently, with the trial court to determine whether to grant judicial diversion or, alternatively, to determine the length and manner of his sentences. As a part of this agreement, the State entered a nolle prosequi without costs in counts 4 and 6.

On July 17, 2024, the Defendant, while out on bond for the above charges, was arrested on felony charges of possession of marijuana with intent to sell or deliver and unlawful possession of a weapon. A few days later, the State filed a motion to revoke the Defendant's bond based on the new charges. The Defendant then filed a petition for judicial diversion.

**Sentencing Hearing.** At the Defendant's August 12, 2024 sentencing hearing, the State introduced the Defendant's presentence report into evidence, which showed the Defendant had no criminal record or gang affiliation, had graduated from North Side High School in Jackson in 2023, and planned to attend Austin Peay State University and to major in physical therapy. At the time the report was compiled, the Defendant had been previously employed at Pacific Manufacturing, UGN, and Black & Decker. The report also stated that "marijuana [was] the only drug [the Defendant] ha[d] used within his lifetime," that the Defendant smoked marijuana one to three times per month starting at age 16, and that the Defendant last used marijuana in June 2024. The report also contained a Risk and Needs assessment, which concluded that the Defendant's overall risk score was moderate.

Trooper Ethan Storms of the Tennessee Highway Patrol testified that on July 29, 2023, at 11:37 a.m., he was patrolling the area around U.S. Highway 45 Bypass when he observed a maroon Nissan sedan driving 68 miles per hour in a 55 mile-per-hour zone. When Trooper Storms activated his blue lights and siren to conduct a traffic stop, the Defendant led him on a high-speed chase lasting approximately five minutes.

The recording from Trooper Storms' dash camera was admitted into evidence without objection. It depicted Trooper Storms traveling northbound on U.S. Highway 45 Bypass when the Defendant drove past him heading southbound at a high rate of speed.

Trooper Storms made a "U" turn over the median, activated his siren, and accelerated to catch up with the Defendant. Trooper Storms continued to pursue the Defendant, and as they approached the State Street intersection, the Defendant turned right and accelerated. Trooper Storms then informed dispatch he was in pursuit of a maroon Nissan Maxima. The Defendant's Nissan approached another intersection and turned right on Taft Alley. The Defendant then swerved onto the wrong side of the road to pass a vehicle, traveled down Washington Street, and then turned right onto Riverside Drive. A moment later, the Defendant's Nissan crossed a double yellow line to pass another vehicle, accelerated over a long stretch of road, and then turned into a gas station parking lot to avoid traffic at a stop sign before merging back onto the Riverside Drive and continuing to evade Trooper Storms. The Defendant continued to drive at a speed clearly exceeding the posted 40 mile-per-hour speed limit and then crossed a double yellow traffic line onto the wrong side of the road to pass two vehicles in front of him, narrowly avoiding oncoming traffic. A short time later, the Defendant lost control of the Nissan vehicle and spun out into the front yard of a house, hitting a small road sign but causing no other readily apparent property damage. When the Nissan came to a stop, the driver's side door opened, and the Defendant fled. The recording showed that Trooper Storms stopped his patrol car and chased the Defendant on foot.

After the video concluded, Trooper Storms said he attempted to catch up to the Defendant's vehicle, which was traveling at roughly 90 miles per hour in a 45 mile-per-hour zone. Trooper Storms identified the Defendant as the driver of the maroon Nissan and stated that at the end of the chase, the Defendant and his three passengers exited the vehicle and were later apprehended.

On cross-examination, Trooper Storms acknowledged that the Defendant's high-speed chase did not result in any injuries or any property damage of any significance. He saw the Defendant drop a small tan bag containing marijuana by the driver's side door as he exited his vehicle. He also found marijuana and some pills, later determined to be Levetiracetam, in the backseat of the Defendant's car. Trooper Storms said the Defendant reached a top speed of 93 miles per hour during the high-speed chase. In response to questioning from the trial court, Trooper Storms stated that approximately one mile prior to the Nissan coming to a stop, the Defendant's front seat passenger stuck his arm out the window, and a witness later informed him that there was an unloaded ten-millimeter Glock handgun lying in the road in this area.

Officer Jeffrey Wood of the Jackson Police Department testified that in the early afternoon of July 17, 2024, nearly a year after the July 2023 high-speed chase, the Defendant was involved in a different incident, which resulted in criminal charges that were pending at the time of the Defendant's sentencing hearing. During the 2024 incident,

Officer Wood observed a vehicle traveling 59 miles per hour in a 40 mile-per-hour zone. Donavan Peterson was driving this vehicle; the Defendant was in the front passenger seat, and Montrevious Garrett was in the backseat of the vehicle. When Officer Wood attempted to initiate a traffic stop by activating his lights and siren, this vehicle continued driving for approximately a mile before it abruptly stopped. Officer Wood approached this vehicle, drew his weapon, and began giving commands. He and another officer detained Peterson and his two passengers, the Defendant and Garrett. During a search of this vehicle, the officers found a rifle; a handgun in the driver's floorboard; a second handgun in the front passenger's floorboard; a second AR-15 style assault rifle; cash in the front passenger's floorboard; and a red duffel bag inside the vehicle. When officers opened this duffle bag, they noticed a "strong odor of marijuana" emanating from it. Inside the bag, the officers found "taped up, wadded up plastic . . . [with] a green leafy substance inside it," which was sent to the Tennessee Bureau of Investigation for analysis. Officer Wood explained that he had not received the results of this testing by the time of the sentencing hearing, which was only a couple of weeks after this incident. Officers also found "plastic baggies, a couple of digital scales," and "ammunition" for the four guns in the bag. As a result of this incident, the Defendant was charged with unlawful carrying or possession of a firearm and possession of marijuana with intent to sell or deliver. Officer Wood stated that, to his knowledge, those charges had not yet been adjudicated because he had not been subpoenaed to testify at court.

On cross-examination, Officer Wood said that the Defendant did not attempt to flee the scene when exiting the car during the 2024 incident. Officer Wood believed the driver, Donovan Peterson, admitted that the red duffle bag and its contents, including the two ounces marijuana, scales, and baggies, belonged to him, but he was unsure whether Peterson claimed ownership of the guns or cash found inside the car. Officer Wood acknowledged that he did not know how long the Defendant had been in the vehicle at the time of this incident. He acknowledged that he had no information suggesting the cash found in the car belonged to the Defendant.

The Defendant testified in his own behalf. He first discussed the July 17, 2024 incident. He stated that Peterson picked him up approximately one hour before the July 2024 traffic stop. The Defendant acknowledged that although he saw three guns when entering the car, he still got into the vehicle. However, he said he never touched any of these guns. He claimed he was not overly concerned about the guns in the car because they planned to go fishing at a pond owned by Peterson's grandparents. He did not notice anything in the backseat when he first got into Peterson's car and never saw anyone carrying a red bag. He denied that anyone in the car openly smoked marijuana in his presence.

- 4 -

The Defendant claimed that when he realized Officer Wood was trying to initiate a traffic stop, he told Peterson several times to "just pull over." However, Peterson kept driving because he was "scared" and did not "know what to do." The Defendant said Peterson finally stopped his vehicle after the Defendant told him to pull over four or five times. During this incident, the Defendant never tried to run and told the officers at the scene that he was innocent. He said he did not realize there was a red bag in the car until the officers began pulling things out of Peterson's backseat. The Defendant asserted that he was planning to mount a defense to the charges from the July 17, 2024 incident.

As for the incident on July 29, 2023, the Defendant said he took "full responsibility for [his] actions." He claimed the 2023 incident, which occurred when he was eighteen years old and had just graduated from high school, taught him to not run from the police. The Defendant insisted that he had been doing better after the 2023 incident until the 2024 incident "brought [him] back down."

The Defendant said that he planned to attend Austin Peay University, but when the 2023 incident occurred, he had to delay those plans and put aside money for a lawyer. He said he still hoped to go to college and to study physical therapy. The Defendant said he had played basketball for three years in high school, which "taught [him] discipline." He also said that he had worked two retail jobs and three factory jobs, three of them full-time, and that he had been employed until this case occurred. The Defendant said he willingly worked every day "to make [his] own money" so he would not have to depend on anyone else. He acknowledged telling the presentence investigator that the only drug he used was marijuana, which he smoked every other weekend. He said he was truthful with the presentence investigator when he told her that the last time he smoked marijuana was on his nineteenth birthday. He claimed he had never used cocaine or methamphetamine.

The Defendant said he was asking the trial court to grant him judicial diversion. He asserted that if the trial court granted him diversion, he intended to work full-time at Berry Plastics, where his mother was employed, so he could "get back on [his] feet and save . . . some money." He also still intended to apply to college. The Defendant confirmed that he would be able to pass a drug test the day of the sentencing hearing.

On cross-examination, the Defendant stated that when he entered Peterson's car on July 17, 2024, he never asked anyone where the guns came from or why they were in the car. He claimed the handgun was not in the front passenger floorboard when he got into the passenger seat. Instead, he asserted that this handgun was on the driver's side in the cupholder and that when Peterson started driving fast and swerving, a gun fell out of the cupholder and landed on his seat, and the Defendant knocked it into the floorboard. The Defendant said he never told Peterson that he did not want any guns in the car. He claimed

- 5 -

he first saw the red duffle bag, which contained marijuana, when an officer pulled it out of the backseat of Peterson's car during the search. The Defendant also claimed he never smelled marijuana inside the car.

In response to questioning from the trial court, the Defendant confirmed that the last time he smoked marijuana was on his nineteenth birthday, which was on June 30, 2024. He admitted he told the presentence investigator that he used marijuana one to three times per month and commonly smoked marijuana with his friends every other weekend. When the trial court asked him why he was smoking marijuana while his criminal charges were pending, the Defendant replied, "I don't really know. It was really a dumb decision. . . [I]t was my 19th birthday, . . . I really just wanted to have a good time, wanted to go out with my friends, just chill, and [to] party, [we] had a great time." The Defendant agreed he was eighteen years old when he received the July 2023 charges, posted bond for those charges, and got released. When the trial court again asked why he would smoke marijuana while out on bond, the Defendant replied, "I don't know. . . It was just really a habit. A really dumb decision." However, he insisted that he had not smoked marijuana since his nineteenth birthday.

The trial court then asked him why he would get into Peterson's car after seeing guns inside while he was out on bond and not supposed to be involved in any criminal activity, and the Defendant answered, "I didn't pay no mind to it because I thought we [were] going to go to . . . just fish. Like I didn't really pay no mind to it." The Defendant admitted that when he got in Peterson's car, he observed two handguns and one rifle. When the trial court asked why he got into the car anyway, the Defendant replied, "I don't know. . . . I know it was a bad decision." He admitted that at the time, Peterson was not old enough to carry a gun. The trial court next asked why the Defendant was carrying a handgun on July 17, 2024, and the Defendant replied that the handgun in the passenger floorboard did not belong to him and that this gun was already in the car when he got in.

Presentence Investigator Kierra Kirby testified that she completed the Defendant's presentence investigation report and met with the Defendant on July 11, 2024. Her investigation showed the Defendant had no juvenile or adult criminal convictions and that the Defendant had no gang affiliations. Investigator Kirby said the Defendant disclosed that although he had not consumed alcohol in the last six months, he had used marijuana one to three times per month and had last used marijuana on June 30, 2024, his nineteenth birthday. She said the Defendant reported that he had never used any other drugs. Investigator Kirby said she did not require the Defendant to take a drug test the day of his presentencing investigation.

In performing the Strong-R assessment, Investigator Kirby determined that the

Defendant's "risk level was moderate." She noted that the Defendant had "high needs in education, residential; moderate needs in attitudes and behaviors of family; and low needs in mental health, alcohol/drug use, employment, aggression, and friends." However, she believed that the Defendant's drug use score should have been "high" because of his frequent use of marijuana. Investigator Kirby acknowledged that the Defendant said he was interested in attending college and that he had a stable home with his family. Investigator Kirby noted that the Defendant was referred to the State's cognitive behavioral intervention program. She also said that if the trial court granted the Defendant judicial diversion or probation, the Defendant would be subject to random monthly drug and alcohol screenings. Upon questioning by the trial court, Investigator Kirby said she was unaware that the Defendant had been arrested on July 17, 2024. She acknowledged she had not done a new presentence report based on the Defendant's new charges.

In determining the Defendant's sentence, the trial court stated that it would consider the evidence that was presented at the time of the guilty plea;[1] the evidence presented during the sentencing hearing, including the presentencing investigation report; and the purposes and principles of sentencing and sentencing alternatives. Regarding the nature and characteristics of the criminal conduct involved, the court found that this was "obviously a very serious matter" that involved "the [D]efendant committing several offenses." It found that the Defendant was driving 68 miles per hour in a 55 mile-per-hour speed zone. The court also noted that Trooper Storms' dash camera footage showed that he attempted to stop the Defendant by activating his blue lights and siren and that he made a "U" turn attempting to catch up with the Defendant. In addition, the footage showed that Trooper Storms traveled at 93 miles per hour in a 45 mile-per-hour zone on a two-lane road to catch up with the Defendant, which "created a high risk of injury to other motorists on the roadway," put the "pursuing law enforcement officers" at a "risk of injury," and put the occupants of the Defendant's vehicle "at risk." In addition, this footage established that when Trooper Storms got close to the Defendant's car, the Defendant "fled at a very high rate of speed." The court recognized that the Defendant "pass[ed] cars in the opposite lane of traffic going around a curve" while going 93 miles per hour in a 45 mile-per-hour speed zone and that this "high-speed pursuit lasted approximately five to ten minutes."

The court also found that the "only reason" the Defendant's vehicle stopped was because the Defendant "lost control of his vehicle" and his car ran "off the roadway, ran up into a yard," and then "[the Defendant], along with the three occupants of the vehicle all bail[ed] out of the vehicle and start[ed] running on foot," even though they were arrested ten minutes later. The trial court said the video depicted the Defendant "driving in a

---

[1] Although the Defendant did not include the transcript from his plea submission hearing, we conclude that the appellate record is sufficient for our review of the issues raised.

reckless manner" and showed him "committing felony evading arrest by fleeing in a motor vehicle from the law enforcement officers." The court also found that an officer later found "2.38 grams of marijuana" in the Defendant's car and that the Defendant "pled guilty to attempting to tamper with evidence" because he dropped a "tan bag, filled with marijuana" as he was attempting to flee. The court also noted that other "contraband" items were found, and the Defendant "pled guilty to committing each of these offenses." Based on this evidence, the trial court determined that the "nature and characteristics of the [Defendant's] criminal conduct" were "serious."

The court also stated that it was considering "the evidence and information" as to "mitigating factors and enhancement factors" as well as the "statistical information provided by the Administrative Office of the Courts as to sentencing practices for these types of offenses." In addition, it was considering the Defendant's testimony concerning his actions as well as the Defendant's "potential for rehabilitation" and his "potential for treatment." The trial court determined that the Defendant was a "Range I standard offender" for the felony evading arrest and the attempted tampering with the evidence convictions. It also recognized that there was a "mandatory minimum jail sentence" for the felony evading arrest conviction.

The trial court applied several enhancement factors. First, the court found that the Defendant had "a previous history of criminal behavior in addition to [what was] necessary to establish the appropriate range." See Tenn. Code Ann. § 40-35-114(1). The court noted that although the Defendant did not have any prior convictions, the Defendant had a history of criminal behavior because of his illegal use of marijuana and alcohol as a minor. The court said that although the only drug the Defendant used was marijuana, the Defendant admitted to Investigator Kirby that he began using marijuana when he was sixteen years old and that he used "marijuana at least one to three times a month." The court also said the Defendant admitted during his testimony that he used marijuana "every other weekend" with his friends. In addition, the trial court noted that the Defendant admitted to smoking marijuana on June 30, 2024, which would have been just a few days after he "pled guilty in this case," while he was "out on bond," and while his sentencing in this case was pending. The court held that it was giving the enhancement factor regarding the Defendant's criminal behavior "great weight."

Second, the trial court applied the enhancement factor that the Defendant was "a leader in the commission of these offenses involving two or more criminal actors." See id. § 40-35-114(2). The court stated that it was also giving "great weight" to this factor because the Defendant was "operating this motor vehicle" on July 29, 2023, and because the Defendant pled guilty to "speeding and reckless driving and the felony evading arrest."

- 8 -

Third, the trial court applied the enhancement factor that the Defendant "had no hesitation about committing a crime . . . when the risk to human life was high." See Tenn. Code Ann. § 40-35-114(10). The court specifically asserted that Trooper Storms' dash camera video supported application of this factor, which showed the Defendant was fleeing at "93 miles per hour in a 45 mile[-]per[-]hour zone" which was "twice . . . the legal speed limit . . . on that two-[lane] highway[.]" The court asserted that the Defendant risked the life of the pursuing officers as well as all the other motorists, who were "try[ing] to get off to the side of the road" because the Defendant was "passing them in a curve" at a "high rate of speed." The court also noted that at some point, the Defendant "left the roadway" and "went through a parking lot area of a . . . gas station in order to avoid people who were stopped at the . . . stop sign." It further recognized that "just a few minutes later" the Defendant "wrecked his vehicle," which also endangered the lives of "his three friends that were in the car with him." For these reasons, the trial court gave "great weight" to this enhancement factor.

The trial court also considered the Defendant's behavior since his arrest on July 29, 2023. He noted that the Defendant posted a $10,000 bond and was released on July 31, 2023. While the Defendant was out on bond, he was arrested again on July 17, 2024. The trial court accredited Officer Wood's testimony that a vehicle the Defendant was riding in was traveling at 59 miles per hour in a 45 mile-per-hour zone, that this vehicle refused to stop after Officer Wood activated his blue lights and siren, and that this vehicle fled for approximately one mile before finally coming to an abrupt stop. The court observed that four guns were found in this vehicle, including one handgun in the floorboard on the front passenger side where the Defendant was sitting. The Defendant admitted that when he got into that vehicle, he observed two handguns and the AR-15 assault rifle, which indicated the Defendant's "unwillingness to follow the rules [while on bond]." The court also observed that since the Defendant's 2023 arrest and release on bond, the Defendant had "continued to use marijuana, which is illegal."

In addition, the court said the Defendant was "arrested and charged with committing new felony offenses while out on bond[,]" including possession of marijuana with the intent to sell and deliver based on the marijuana found inside the vehicle. The trial court specifically noted that there were "four firearms located in the . . . vehicle with the three occupants that were arrested," which resulted in the Defendant being charged with unlawful possession of a deadly weapon while he was out on bond. The court stated that because of the Defendant's new offenses, the State filed a motion to revoke the Defendant's bond, and the trial court held that it would grant the motion to revoke bond based on the Defendant's rearrest for the new felony offenses. In determining whether the Defendant was a good candidate for judicial diversion or probation, the court recognized that although the Defendant did not have any prior criminal convictions at the time he committed the

2023 offenses, the Defendant continued to use marijuana while out on bond, even as recently as June 30, 2024.

Regarding the mitigating factors, the trial court found that the Defendant had "a good relationship with his family." The trial court also gave the Defendant "some mitigation" for his employment history. It also noted that the Defendant could pay at least one hundred dollars a month toward his fines and court costs. Regarding the Defendant's risk and needs assessment, the court found the Defendant's low needs score in alcohol and drug use "hard to believe" and "hard to understand" given the Defendant's admission to Investigator Kirby that he had "been using drugs, marijuana, even as recently as the end of June of 2024."

The trial court recognized that the Defendant had a certification of eligibility for diversion, which correctly showed that he had not previously been granted diversion and that he did not have a prior disqualifying felony or misdemeanor conviction. The court then considered the factors for judicial diversion and probation. Regarding the Defendant's amenability to correction, it found this factor "weigh[ed] very slightly in favor of the granting of diversion" because the Defendant had "no prior criminal record." However, the trial court asserted that the Defendant had been "continuously violating the law by using marijuana each and every month while he's been out on bond," which "reflects poorly on his potential for rehabilitation." The court also noted that the Defendant had "been rearrested on more charges while out on bond" that were similar in nature to the 2023 charges because they involved the possession of a weapon and the possession of marijuana with the intent to sell or deliver.

As for the circumstances of the offense, the court found this factor "weigh[ed] very heavily against the granting of diversion[.]" It stated, "[The Defendant] placed the lives of many individuals at risk when he committed this felony evading arrest, along with these other charges for which he's being sentenced." Specifically, the court noted "the danger he created to other motorists, the danger he created to his own occupants of the vehicle, and the danger he created to the law enforcement officers attempting to stop the vehicle." Regarding the Defendant's criminal record, the court again noted the Defendant had "no prior convictions" but the Defendant had "more charges pending, which occurred after the presentence investigation report was prepared." Ultimately, the trial court found the Defendant's criminal record to be "slightly in favor" of diversion, but "it's kind of overcome by the fact that he has these new pending charges forthcoming."

As for the Defendant's social history, the trial court noted, "[The Defendant] does have this long history of drug abuse, marijuana[.]" Consequently, the court found this factor "weigh[ed] against the granting of diversion." Regarding the Defendant's mental

- 10 -

and physical health, the court noted, "Apparently, there's not anything physically or mentally wrong with the [D]efendant, although he does have this substance abuse problem, which I think he's admitted to[.]" The court found, "[A]gain, I find that weighs slightly against the granting of diversion in this case." As for the deterrent effect, both as to the Defendant and other similarly situated defendants, the trial court found that this factor "weigh[ed] very heavily against the granting of diversion" because the Defendant during the 2023 incident "had every opportunity to stop his vehicle," which would have "avoided . . . these serious offenses involving felony evading arrest." The court also recognized that although the Defendant pled guilty to the "drug offenses," the Defendant "did attempt to . . . dispose or hide or conceal some of the evidence by throwing it out of the door, out of the window from the vehicle." As a result, the trial court concluded that this factor "weigh[ed] against the granting of diversion in this case" because it does not "serve[] the interests of the public to grant diversion under these circumstances."

The trial court also considered the Defendant's attitude since his arrest:

[W]hen [the Defendant] got arrested and posted bond back in July of 2023, he had an opportunity not to go out and continue violating the law . . . [h]e [even] said something about [how] he learned a valuable lesson, well, obviously, he didn't learn a valuable lesson in July of 2023 because in July of 2024, he's still committing the same type of offenses for which he's been arrested and charged.

He's continued to use illegal drugs every month since his arrest, which . . . shows that . . . his attitude [and] behavior [have not] changed at all. If anything, it's just continued.

Ultimately, the trial court held that the Defendant's attitude and behavior since his arrest "weigh[ed] heavily against the granting of diversion in this case." The trial court also found that the Defendant's current drug usage "weigh[ed] very heavily against the granting of diversion in this case." Regarding the Defendant' past employment, the court found that factors "weigh[ed] . . . slightly in favor of the granting of diversion."

The trial court placed a particular emphasis on "the attitude of law enforcement officers," stating:

[F]inally, the attitude of law enforcement officers, and I want to emphasize this. You know, we have too many officers who are having to put their lives at risk every day because of people like [the Defendant], who for whatever reason just decide, well, I'm not going to stop. You know, I was

- 11 -

speeding.  Yeah, I know I've got marijuana in the car.  Yeah, I know I've got other illegal items in the car.  But I'm not going to stop.  You're going to have to chase me down.

I mean, that's [the Defendant's] attitude and, you know, the officer, again, had to do his job, and he's going down this very narrow two-lane roadway trying to get the [D]efendant to stop and instead of him slowing down, he's traveling 93 miles per hour.  I mean, [the Defendant was] obviously endangering the lives of a lot of people out there by his criminal activity.

So, I find that . . . the attitude of law enforcement is certainly important in denying diversion in this particular case.

The trial court held that "for all of those reasons[,]" the Defendant was "not a good candidate for judicial diversion."

The court also found that "the Defendant would not abide by [the] terms of [full] probation, if given an opportunity[,] because of the fact that he continues to use illegal drugs, he's continued to be arrested on new offenses while out on bond."  The court also found that "a sentence of full probation [after the Defendant's service of the required thirty days in jail] would unduly depreciate the seriousness of these offenses."

The trial court found the Defendant was a Range I offender and imposed the following sentences:  thirty days in the Madison County Jail at 75% release status for the speeding conviction; six months in the Madison County Jail at 75% release status for the reckless driving conviction; two years in the Tennessee Department of Correction for the felony evading arrest conviction; eleven months and twenty-nine days in the Madison County Jail at 75% release status for the simple possession of marijuana conviction; and three years in the Tennessee Department of Correction for the attempted tampering with evidence conviction.  After noting that the Defendant had "some potential for rehabilitation, assuming he gets [his] drug problem behind him," the trial court ordered the Defendant to serve "a period of 180 days of shock incarceration in the Madison County Jail" before serving the remainder of his three-year sentence on "intensive state probation" supervised by the "[D]epartment of [P]robation and [P]arole."  The court noted that while on intensive state probation, the Defendant would have to report to a probation officer each month and would be drug tested at least twice a month.

In addition, the court ordered the Defendant to complete an alcohol and drug evaluation, to successfully follow any recommendations for treatment or counseling, to

participate in any behavior modification that the department of probation recommended, and to maintain full-time employment while on supervised probation. Moreover, the trial court imposed a fine for the simple possession of marijuana conviction and revoked the Defendant's driving privileges for two years for the felony evading arrest conviction. The trial court stated that if he tested positive for drugs over the term of his sentence, the Defendant would be required to serve his three-year sentence. The trial court based its sentencing decision, in part, on the Defendant's "young age." During the August 12, 2024 hearing, the trial court revoked the Defendant's bond, and an order was entered shortly thereafter. On August 19, 2024, judgments reflecting the Defendant's sentences were entered. Immediately following the sentencing hearing, the Defendant timely filed a notice of appeal.

**Post-Appeal Motions.** The day after the sentencing hearing, the Defendant filed a motion for release pending appeal pursuant to Rule 8 of the Tennessee Rules of Appellate Procedure, based in part on the Defendant's claim that he was "wholly innocent" of the charges stemming from the July 17, 2024 incident. On August 21, 2024, a panel of this court denied the Defendant's motion for release pending appeal. The Defendant then filed a motion to take judicial notice of the dismissal of the felony charges associated with his July 17, 2024 arrest pursuant to Rule 13(c) and Rule 22 of the Tennessee of Rules Appellate Procedure. In that motion, the Defendant argued that the dismissal of these felony charges should be considered in this court's determination of whether the Defendant should be admitted to bail and in this court's review of the trial court's denial of judicial diversion and the imposition of sentence in this case. This court subsequently denied the Defendant's motion to take judicial notice to the extent that it could be construed as a motion to reconsider his motion for bail pending appeal. However, regarding the Defendant's request that this court take judicial notice of the dismissal of the charges in reviewing the denial of judicial diversion and sentencing, this court deferred the motion to the panel assigned to hear the Defendant's case and permitted the parties to address this issue in their respective briefs.

## ANALYSIS

The Defendant argues that the trial court unreasonably denied him judicial diversion and that the trial court's imposition of a sentence involving six-months of incarceration was excessive. He claims the trial court's sentencing decisions are not entitled to a presumption of reasonableness and should be reviewed de novo. Alternatively, he asserts that even if the trial court's sentencing decision is entitled to a presumption of reasonableness, this presumption is overcome by the trial court's erroneous factual findings regarding his marijuana use and his involvement in the July 2024 incident and by the trial court's failure to consider the relevant factors for judicial diversion and probation.

"[T]he abuse of discretion standard accompanied by a presumption of reasonableness applies to all sentencing decisions, including the grant or denial of judicial diversion, when the trial court properly supports its decision on the record in accordance with the purposes and principles of sentencing." State v. King, 432 S.W.3d 316, 329 (Tenn. 2014); see State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012) (applying the abuse of discretion standard, accompanied by a presumption of reasonableness, to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including probation or any other alternative sentence). "'Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" State v. Herron, 461 S.W.3d 890, 904 (Tenn. 2015) (quoting State v. Parker, 350 S.W.3d 883, 896-97 (Tenn. 2011)). The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012).

**I. Judicial Diversion.** First, the Defendant argues that the trial court unreasonably denied him judicial diversion. He claims the trial court's decision is not entitled to a presumption of reasonableness because (1) the court emphasized an irrelevant factor, namely the attitude of law enforcement; (2) the court ignored one of the most important factors, namely the Defendant's interest in avoiding a felony conviction as a nineteen-year-old aspiring college student who wants to work in health care; and (3) the court made erroneous factual findings regarding his history of marijuana use and his charges from the July 2024 incident, which were ultimately dismissed. The Defendant asserts that if a de novo standard of review is applied, the common law factors favor the grant of judicial diversion. Finally, the Defendant contends that even if the presumption of reasonableness applies to the trial court's denial of judicial diversion, the trial court's erroneous factual findings about his marijuana use and involvement in the July 2024 crimes amounted to an abuse of discretion. The State responds the trial court did not abuse its discretion in denying judicial diversion to the Defendant. We agree with the State.

The Tennessee Supreme Court has described judicial diversion has a "legislative largess" available to qualified defendants. State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999). Under the judicial diversion statute, if a qualified defendant is guilty of an offense that is otherwise eligible for diversion, then the guilty plea or verdict is "held in abeyance[,]" and "further proceedings are deferred under reasonable conditions during a probationary period established by the trial court." Rodriguez v. State, 437 S.W.3d 450, 455 (Tenn. 2014) (citing Tenn. Code Ann. § 40-35-313(a)(1)(A)); see State v. Dycus, 456 S.W.3d 918, 925 (Tenn. 2015). If the defendant completes this diversionary period, then the trial court will discharge the defendant and dismiss the case without any finding of guilt

- 14 -

or the entry of a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(2), (b). Thereafter, the defendant may seek to expunge all official records associated with his "'arrest, indictment or information, trial, finding of guilty, and dismissal and discharge.'" State v. Parsons, 437 S.W.3d 457, 495 (Tenn. Crim. App. 2011) (quoting Schindler, 986 S.W.2d at 211). However, if a defendant violates the terms of diversionary period, "the court may enter an adjudication of guilt and proceed as otherwise provided." Tenn. Code Ann. § 40-35-313(a)(2). A trial court may order judicial diversion for qualified defendants who are found guilty or have entered a guilty or nolo contendere plea to a Class C, D, or E felony or a lesser crime; have not previously been convicted of a felony or Class A misdemeanor; and are not seeking deferral for a sexual offense, driving under the influence of an intoxicant, vehicular assault prior to the service of the minimum sentence, and other enumerated crimes against the elderly or vulnerable adults. Tenn. Code Ann. § 40-35-313(a)(1)(B)(i).

It is undisputed that the Defendant is eligible to receive judicial diversion under Code section 40-35-313(a)(1)(B)(i)(a)-(e). However, a defendant's statutory eligibility for judicial diversion does not "constitute entitlement to judicial diversion." King, 432 S.W.3d at 323. "[I]nstead, the decision of whether to grant or deny judicial diversion is entrusted to the discretion of the trial court." Id. (citing Tenn. Code Ann. § 40-35-313(a)(1)(A) ("The court may defer proceedings against a qualified defendant . . . ." (emphasis added)).

The trial court must consider the following factors in deciding whether a qualified defendant should be granted judicial diversion: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the ends of justice—the interests of the public as well as the defendant. State v. Electroplating, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)); see King, 432 S.W.3d at 326 (asserting that "Bise, Caudle, and Pollard did not abrogate the requirements set forth in Parker and Electroplating, which are essential considerations for judicial diversion"). The trial court may also consider "'the applicant's attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility and attitude of law enforcement.'" State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993) (quoting State v. Markham, 755 S.W.2d 850, 852-53 (Tenn. Crim. App. 1988) (citations omitted)). "[T]he trial court must weigh the factors against each other and place an explanation of its ruling on the record." King, 432 S.W.3d at 326 (citing Electroplating, 990 S.W.2d at 229).

Under the Bise standard of review, when the trial court considers the

- 15 -

Parker and Electroplating factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision.

Id. at 327. "Substantial evidence" is "[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." Black's Law Dictionary 640 (12th ed. 2024). While the trial court is not required to recite all the Parker and Electroplating factors when justifying its decision to grant or deny judicial diversion, the record should show that the trial court considered these factors in rendering its decision and that the court identified the specific factors applicable to the case before it. King, 432 S.W.3d at 327. From that point, "the trial court may proceed to solely address the relevant factors." Id.

However, if the trial court "fails to consider and weigh" the Parker and Electroplating factors, "the presumption of reasonableness does not apply and the abuse of discretion standard, which merely looks for 'any substantial evidence' to support the trial court's decision, is not appropriate." Id. (citing State v. Pollard, 432 S.W.3d 851, 863-64 (Tenn. 2013)). In such a scenario, the reviewing court "may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration." Id. at 328. The reviewing court has the discretion to determine whether it should conduct a de novo review or remand to the trial court for reconsideration. Id. "Relevant considerations include the adequacy of the record, the fact-intensive nature of the inquiry, and the ability of the court to request supplementation of the record." Id. (citations omitted).

Here, the record shows the trial court properly considered and weighed the relevant factors in determining the Defendant's suitability for judicial diversion. Although the Defendant claims the trial court's denial of diversion is not entitled to a presumption of reasonableness because the trial court failed to adequately consider the interests of the Defendant and placed undue emphasis on an irrelevant factor, namely the attitude of law enforcement, we disagree.

While the trial court did not explicitly state it was considering the interests of the Defendant in its decision regarding judicial diversion, the trial court stated it was basing its sentencing decision on the Defendant's "young age." The trial court also said it understood the impact pleading guilty and being arrested on new charges could have on the Defendant's ability to keep his job. While the Defendant argues the trial court only considered his age in its imposition of a split sentence of confinement and probation, not

its denial of diversion, we note that the common law factors for judicial diversion are identical to the common law factors for probation. See State v. Trent, 533 S.W.3d 282, 291 (Tenn. 2017) (citing Electroplating, 990 S.W.2d at 229). Accordingly, we conclude that the trial court adequately considered and weighed the Defendant's interests but ultimately determined that most of the factors weighed against the grant of judicial diversion. See State v. Brooks, No. W2015-00833-CCA-R3-CD, 2017 WL 758519, at *9 (Tenn. Crim. App. Feb. 27, 2017) (finding adequate consideration of the Parker and Electroplating factors when the trial court did not explicitly state it had considered the defendant's interests in denying judicial diversion).

The Defendant also contends that the trial court's denial of diversion is not entitled to a presumption of reasonableness because it placed undue emphasis on "the attitude of law enforcement," which is not one of the Electroplating factors. We find this argument unpersuasive. Because the trial court adequately considered the seven factors outlined in Electroplating and Parker, it was permitted to consider the factors outlined in Washington, 866 S.W.2d at 951, including the attitude of law enforcement.

In this case, the trial court identified and applied the correct legal standards relevant to judicial diversion. It considered the Parker and Electroplating factors, identified which of these factors were relevant, weighed them, and placed specific findings on the record regarding its reasons for denying judicial diversion to the Defendant, which was within the range of acceptable dispositions in this case. See King, 432 S.W.3d at 327. Even if reasonable minds could disagree regarding the propriety of the trial court's decision, we conclude that the trial court acted within its discretion in denying judicial diversion to the Defendant. Because there was substantial evidence to support the trial court's decision to deny judicial diversion, this decision is afforded a presumption of reasonableness. See id.

The Defendant argues that, even if a presumption of reasonableness applies, the trial court abused its discretion by basing its denial of diversion on clearly erroneous findings of fact regarding his history of marijuana use and his charges from the July 2024 incident, which were ultimately dismissed. We conclude that the trial court did not abuse its discretion because there is substantial evidence in the record, i.e. more than a scintilla, to support the court's denial of diversion. There was abundant proof that the Defendant's frequent marijuana use, even while out on bond, was a factor that weighed against judicial diversion. Even if we take judicial notice that the Defendant's new charges from the July 2024 incident were dismissed, we conclude there was sufficient proof of factors weighing against judicial diversion.

Here, the trial court found that the Defendant's amenability to correction and his criminal history weighed very slightly in favor of diversion. However, the trial court

- 17 -

determined that the remaining factors, namely the circumstances of the offense, the Defendant's social history, the Defendant's physical and mental health, the deterrence value to the Defendant and others, and the interests of justice weighed against granting judicial diversion to the Defendant. Specifically, the trial found that the Defendant's high-speed chase created "a high risk of injury to other motorists," put the "pursuing law enforcement officers" at a "risk of injury," and put the occupants of the Defendant's vehicle "at risk." The court also recognized that following the Defendant's 2023 arrest and his release on bond, the Defendant continued to regularly smoke marijuana, an illegal drug. Regarding the deterrence value to the Defendant and others, the trial court found that this factor weighed very heavily against the granting of diversion because the Defendant had every opportunity to stop his vehicle, thus avoiding the felony evading arrest charge, and because the Defendant attempted to dispose of or conceal some of the evidence of the drug offenses. After weighing all these factors, the trial court determined that the Defendant was "not a good candidate for judicial diversion." Given the trial court's extensive findings, which are supported by the record, we conclude that the trial court did not abuse its discretion in denying judicial diversion to the Defendant.

**II.** **Sentencing.** The Defendant also contends that the trial court imposed an excessive sentence when it ordered him to serve 180 days in jail before serving the remainder of his three-year sentence on supervised probation. The Defendant argues that "[t]o the extent the trial court even analyzed [the issue of probation] distinctly from its analysis of diversion," the trial court seemed to focus on his "marijuana use," "his July 2024 arrest for charges that have been dismissed," and the court's belief there was a need to avoid "unduly depreciat[ing] the seriousness of these offenses[.]" He asserts that "[a]s a first-time Range I offender who had accepted responsibility for and been convicted of Class D felony attempted tampering with evidence; Class E felony evading; and three misdemeanors, [he] was a favorable candidate for alternative sentencing except for the 30-day statutory minimum applicable to his felony evading conviction." See Tenn. Code Ann. §§ 40-35-102(6)(A), 39-16-603(d)(2)(A). He asserts his 180-day jail sentence is six times the mandatory minimum for Class E felony evading arrest and three times the mandatory minimum for Class D felony evading arrest.

The Defendant claims that the excessive length of his jail sentence and the trial court's failure to suspend all but the mandatory minimum confinement period stemmed from the court's erroneous factual findings concerning the extent of the Defendant's occasional marijuana use and his charges from the July 2024 incident, which were dismissed; the court's failure to consider all the relevant Trent factors; and the court's failure to consider the purposes and principles of sentencing. In response, the State argues that the trial court did not impose an excessive sentence on the Defendant. We conclude that the trial court did not abuse its discretion by imposing a within-range three-year

sentence and by requiring the Defendant to serve 180 days in jail before serving the remainder of his sentence on supervised probation.

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;
(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and
(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401, Sentencing Comm'n Cmts.

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40-35-102(6)(A) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in this subsection. Tenn. Code Ann. § 40-35-102(6)(D). A trial court should consider the following when determining whether there is "evidence to the contrary," indicating that an individual should not receive alternative sentencing:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

- 19 -

Id. § 40-35-103(1)(A) - (C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. Id. (citing Tenn. Code Ann. § 40-35-303(b) (footnote omitted)).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. Tenn. Code Ann. § 40-35-303(a). However, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would "'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

"'[T]he guidelines applicable in determining whether to impose probation are the same factors applicable in determining whether to impose judicial diversion.'" Trent, 533 S.W.3d at 291 (quoting State v. Scott, No. M2010-01632-CCA-R3-CD, 2011 WL 5043318, at *11 (Tenn. Crim. App. Oct. 24, 2011)); see also State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978)). When considering probation, the trial court should consider the following factors: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) special and general deterrence value; and (7) the interests of the public as well as the accused. Trent, 533 S.W.3d at 291 (citing Electroplating, 990 S.W.2d at 229).

The principles of sentencing required the trial court to impose "a sentence justly deserved in relation to the seriousness of the offense[.]" Id. § 40-35-102(1). In addition, the trial court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4). The Sentencing Act "assure[s] fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions[.]" Id. § 40-35-102(2). It also states that "[i]nequalities in sentences that are unrelated to a purpose of [the Sentencing Act] should be avoided[.]" Id. § 40-35-103(3). Moreover, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered

in determining the sentence alternative or length of a term to be imposed[,]" and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" Id. § 40-35-103(5).

First, the Defendant challenges the trial court's assessment that there was a need to "avoid depreciating the seriousness" of the Defendant's offenses. Although the Defendant acknowledges the seriousness of his July 29, 2023 offenses, he claims these offenses were not so extreme that they outweighed all other relevant alternative sentencing factors or the relevant purposes and principles of sentencing. In particular, he claims that his July 29, 2023 offenses cannot be characterized as "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree." Trent, 533 S.W.3d at 288, 292-93 (quoting State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997) ("[B]efore a trial court can deny probation solely on the basis of the offense itself, the circumstances of the offense as particularly committed in the case under consideration must demonstrate that the defendant committed the offense in some manner more egregious than is contemplated simply by the elements of the offense."); State v. Fields, 40 S.W.3d 435, 441 (Tenn. 2001) (In order for a trial court to deny alternative sentencing to avoid depreciating the seriousness of the offense under Code section 40-35-103(B), the circumstances of the offense "as committed, must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring probation." (internal citation and quotation marks omitted)).

First, the Defendant contends that his sentence is excessive because although his conduct was much less egregious than the defendant's conduct in State v. Myers, No. E2021-00841-CCA-R3-CD, 2022 WL 2903266 (Tenn. Crim. App. July 22, 2022), he was sentenced more harshly. In Myers, the trial court imposed a two-year sentence, with only thirty days of confinement pursuant to the statutory minimum sentence for felony evading arrest, where the defendant led law enforcement on a high-speed chase reaching speeds of 130 miles per hour, which resulted in the defendant's passenger being ejected from his motorcycle, resulting in knee injuries and requiring multiple surgeries that left the passenger incapacitated for nearly eight weeks. Id. at *1-3. The Defendant claims that requiring him to serve six times the amount of jail time that the defendant in Myers served would deprive the "seriousness" factor of any real substance and would violate other fundamental principles of sentencing, including eliminating unjustified disparity in sentencing, providing a fair sense of predictability, and prioritizing confinement only for those defendants who commit the most severe offenses, who have criminal histories evincing a clear disregard for the laws and morals of society, and who have failed at past efforts of rehabilitation. See Tenn. Code Ann. §§ 40-35-102(2), -102(5), -103(3).

- 21 -

To the extent that the Defendant's argument asks us to conclude that the trial court's judgment represents an "unjustified disparity" in sentencing based on a comparison to a single unpublished case, we decline to do so. The trial court explicitly stated during the sentencing hearing that it was considering "[a]ny statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee." Tenn. Code Ann. § 40-35-210(b)(6). Because the Defendant has failed to show that the trial court did not consider such statistical information before imposing the sentence in the case, we conclude the Defendant is not entitled to relief on this issue.

Second, the Defendant argues the trial court failed to consider all the relevant factors in Trent, 533 S.W.3d at 291, specifically the factors regarding the absence of the Defendant's criminal record, the Defendant's social history (other than his occasional marijuana use), and the Defendant's exceptional physical and mental health. The Defendant claims that because the trial court failed to consider these Trent factors in declining to suspend all but the thirty-day mandatory minimum for the Defendant's evading arrest conviction, this court should not apply a presumption of reasonableness to the court's sentencing decision. Instead, the Defendant argues this court should apply a de novo standard of review to the manner of the sentence imposed, concluding that service of the thirty-day minimum jail period and suspension of the remainder of the sentence is sufficient to punish him. The Defendant asserts that even if this court applies a presumption of reasonableness to the sentencing decision, the trial court abused its discretion by making erroneous factual findings and by failing to consider all relevant purposes and principles of sentencing. Despite the Defendant's claims to the contrary, the record shows the trial court considered the absence of a criminal record for the Defendant, the Defendant's social history, and the Defendant's physical and mental health, noting that although he had nothing wrong with him physically or mentally, he had a substance abuse problem with marijuana. Moreover, we disagree with the Defendant's claim that the trial court made erroneous factual findings and failing to consider the purposes and principles of sentencing.

In this case, the trial court found that the Defendant was a Range I offender who entered guilty pleas to attempted evidence tampering, a Class D felony, and felony evading arrest, a Class E felony, in addition to entering guilty pleas to three misdemeanors for speeding, reckless driving, and simple possession of marijuana. Under the sentencing act, Range I offenders convicted of Class D felonies shall receive a sentence of "not less than two (2) nor more than (4) years," and Range I offenders convicted of Class E felonies shall receive a sentence of "not less than one (1) nor more than (2) years." Tenn. Code Ann. §§ 40-35-112(a)(4), (5). Defendants convicted of Class E felony evading "shall be punished by confinement for not less than thirty (30) days." Id. § 39-16-603(d)(2)(A). In addition, "[a] defendant receiving probation may be required to serve a portion of the sentence in continuous confinement for up to one (1) year in the local jail or workhouse, with probation

- 22 -

for a period of time up to and including the statutory maximum time for the class of the conviction offense." Id. § 40-35-306(a).

The trial court sentenced the Defendant to thirty days in the Madison County Jail at 75% release status for the speeding conviction; six months in the Madison County Jail at 75% release status for the reckless driving conviction; two years in the Tennessee Department of Correction for the felony evading arrest conviction; eleven months and twenty-nine days in the Madison County Jail at 75% release status for the simple possession of marijuana conviction; and three years in the Tennessee Department of Correction for the attempted tampering with evidence conviction. All these sentences constituted within-range sentences for the Defendant's conviction offenses. Because the record shows the trial court imposed within-range sentences that reflected the court's consideration of the purposes and principles of sentencing, we apply the abuse of discretion standard of review, accompanied by a presumption of reasonableness.

We next consider the Defendant's claim that the trial court abused its discretion in refusing to sentence the Defendant to the mandatory minimum of thirty days in jail before serving the remainder of his three-year sentence on supervised probation. In evaluating the factors for probation, which were identical to the factors for judicial diversion, the trial court found that the Defendant's amenability to correction and his criminal history weighed very slightly in favor of the granting of diversion; however, it found that the remaining factors, namely the circumstances of the offense, the Defendant's social history, the Defendant's physical and mental health, the deterrence value to the Defendant and others, and the interests of justice weighed against granting judicial diversion to the Defendant. The trial court specifically found that the Defendant had been continuously violating the law by regularly using marijuana while out on bond, which reflected poorly on his potential for rehabilitation. The court also found the circumstances of the Defendant's 2023 offenses were extremely serious because the Defendant endangered other motorists, the occupants of his own vehicle, and law enforcement. In addition, the trial court determined that the Defendant's long history of drug abuse was problematic. Moreover, the court found that the deterrent effect as to the Defendant and other similarly situated defendants weighed against probation because the Defendant could have avoided these serious offenses by promptly stopping his vehicle and because the Defendant attempted to conceal or discard evidence related to his drug offenses. Even if we take judicial notice that the Defendant's new charges from the July 2024 incident were dismissed, we conclude there was abundant proof of factors weighing against the grant of full probation, aside from the required thirty-day statutory minimum.

The trial court held that a sentence of full probation, other than the required minimum of thirty days in jail, would "unduly depreciate the seriousness" of the

Defendant's offenses. Nevertheless, the trial court recognized that the Defendant had "some potential for rehabilitation" if he took care of his drug problem. It then ordered the Defendant to serve 180 days of "shock incarceration" in the Madison County Jail before serving the remainder of his three-year sentence on supervised probation. As conditions of his sentence, the trial court also ordered the Defendant to be drug tested twice a month, to complete an alcohol and drug evaluation, to follow any recommendations for treatment and counseling, to participate in any behavior modification that the department of probation recommended, and to maintain full-time employment while on supervised probation. The trial court warned the Defendant that if he tested positive for drugs during the term of his sentence, he would be required to serve his three-year sentence in confinement.

The record fully supports the trial court's decision to order the Defendant to serve 180 days of "shock incarceration" before requiring the Defendant to serve the remainder of his three-year sentence on supervised probation. We agree with the trial court that the Defendant failed to establish his suitability for full probation, beyond the minimum thirty days in jail. See Boggs, 932 S.W.2d at 477; Tenn. Code Ann. § 40-35-303(b). The trial court applied the proper legal standards, considered the relevant sentencing factors, and made a final sentencing decision that was consistent with the purposes and principles of sentencing. Accordingly, we conclude the trial court acted within its discretion in imposing a sentence of split confinement in this case.

## CONCLUSION

The judgments of the trial court are affirmed.

s/_____Camille_____R. McMullen_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE

- 24 -